LYTLE ET AL. *v.* THE STATE OF ARKANSAS ET AL. (p. 814.)

Mr. Justice CATRON.

The complainants allege that they have the superior equity to the fractional quarter-section No. 2, and to the other lands claimed by the bill, by virtue of an entry under a preference right; and that the respondents purchased and took their legal title with full knowledge of such existing equity in the complainants.

1. The defendants claiming section No. 2 (or part of it) deny that any such equity exists under the legislation of Congress. 2. That they purchased and took title without any knowledge of the claim set up; and being innocent purchasers, no equity exists as to them for this reason also, regardless of any thing alleged against them. 3. That they expended large sums on the lands purchased, and made highly valuable improvements thereon, without any objection being made by complainants, or notice of their claim being given to respondents, and therefore a court of equity cannot interfere with their existing rights.

The bill was dismissed, without any particular ground having been stated in the decree why it was made for respondents; and in this condition of the record the cause is brought here by writ of error under the twenty-fifth section of the Judiciary Act.

The case made on the face of the bill was rejected, and the inquiry on such general decree must be, whether the claim set up sought protection under an act of Congress, or an authority exercised under one, so as to draw either in question, no matter whether the claim was well founded or not; and the fact being found that such case was made, then jurisdiction must be assumed to examine the decree; and, this being clearly true in the present instance, jurisdiction must be taken, and the equity claimed on part of complainants reëxamined.

If, however, the decree had proceeded on the second or third grounds of defence, regardless of the first, and had so declared, then this court would not have jurisdiction to interfere, as no

act of Congress, or an authority exercised under it, would have been drawn in question.

In regard to the lands claimed, except the fractional quarter-section No. 2, we are agreed that the bill should be dismissed. So far, the controversy is ended; and as to section No. 2, I think the bill should be dismissed also.

The proof of occupancy and cultivation was made in April, 1831, under the act of 1830, pursuant to an instruction from the Commissioner of the General Land-Office having reference to that act. The act itself, the instruction given under its authority, and the proofs taken according to the instruction, expired and came to an end on the 29th of May, 1831. After that time, the matter stood as if neither had ever existed; nor had Cloyes more claim to enter, from May 29, 1831, to July 14, 1832, than any other villager in Little Rock.

July 14, 1832, another preëmption law was passed, providing, among other things, that when an entry could not be made under the act of 1830, because the public surveys were not returned to the office of the register and receiver before the expiration of that act (29th May, 1831), then an occupant who cultivated the land in 1829, and was in actual possession when the act of 1830 was passed, should be allowed to enter under the act of 1832 the quarter-section he occupied; and also adjoining lands to which the improvement extended, in legal subdivisions, so as to increase his entry to a quantity not exceeding 160 acres. Under the act of 1832, the entry in controversy was offered, and afterwards allowed, for the purpose of letting in complainants, so that a court of justice might investigate their claim, although it had been pronounced illegal at the department of public lands, the officers there acting under the advice of the Secretary of the Treasury.

The act of 1830, and the circular under it, having expired, the commissioner issued a new circular (28th July, 1832, 2 Land Laws and Opinions, 509), prescribing to registers and receivers the terms on which entries should be allowed under the act of 1832, by which circular proof was required of cultivation in 1829, and residence on the 29th of May, 1830; and that this proof should be made after the legal surveys were returned to the office of the register and receiver; and the right to make the proof, and to enter, should continue for one year after the surveys were returned, unless the lands were sooner offered at public sale; and that then the entry should be made before the public sale took place.

The necessity of this new proceeding is manifest. By the act of April 5, 1832, all actual settlers at this date (5th April,

1832) were authorized to enter, within six months thereafter, one half quarter-section, including their respective improvements. Such rights stood in advance of claimants under the act of July 14, 1832. In the mutations of a new country, the fact was well known that improvements passed from hand to hand with great frequency by sale of the possessions; and one in possession (April 5, 1832) could well enter an improvement cultivated in 1829, and held on the 29th of May, 1830, he having purchased such possession. If Cloyes, therefore, had sold out to another before the act of April 5th was passed, then that other occupant, and not Cloyes, would have had the right to enter section No. 2; and therefore it was highly necessary to know who had the best right to a preëmption at the time each entry was offered. A still greater necessity existed for new proof. Until the surveys were returned, it was usually improbable for the register and receiver to know what subdivision had been occupied, or to what land, or how much, the preëmption right extended : and as all those who had a right of entry on lands not surveyed and legally recognized as surveyed were provided for by the act of 14th July, 1832, and the act required them to make proof, and to enter, within one year after the surveys were returned, by legal subdivisions according 'to the surveys, it is hardly possible to conceive what other course could have been adopted at the land-office than that which was pursued, as the surveys were the sole guide at the local offices where entries were made. But it is useless to speculate why the new circular was issued ; the commissioner had positive power to do so, and the act, when done, bound every enterer. Nor could a legal entry be made under the act of 14th July, 1832, without the new proof, and an adjudication by the register and receiver, founded on such proof, that the right of entry existed ; and as no such proof was offered by the complainants, they had no right to enter even the $30\frac{88}{100}$ acres, and certainly not the $108\frac{61}{100}$ acres. That an entry could not be lawfully made, without new proof to warrant it, for the lesser quantity, is our unanimous opinion ; and in this we concur with those conducting the General Land-Office.

For another reason, I think their claim should be rejected. Little Rock was the seat of the Territorial government, at which certain public buildings were necessary ; and on the 15th of June, 1832, an act was passed, that there be then granted to the Territory of Arkansas a quantity of land not exceeding one thousand acres, "contiguous to and adjoining" the town of Little Rock, for the erection of a court-house and jail in said town, which lands shall be selected by the Gover-

nor of the Territory, and be disposed of as the Legislature shall direct, and the proceeds be applied towards building said court-house and jail.

On the 30th of January, 1833, the Governor selected the land, and filed his entry in the land-office at Little Rock, which entry was received and forwarded to the General Land-Office at Washington, and there ratified. The entry included the fractional quarter-section No. 2 now claimed by the heirs of Nathan Cloyes.

By the act of March 2, 1833, the Governor of the Territory was required to furnish to the Secretary of the Treasury a description of the boundaries of the thousand acres, and the Secretary was required to cause to be issued a patent therefor to the Governor, in trust, &c. And the Governor was directed to lay off in town lots, as part of the town of Little Rock, so much of the grant as he might deem advisable; and said Governor was authorized to sell said lots, and to dispose of the residue of said thousand-acre grant, and which sale was to be at auction, as regarded the town lots and the residue of the land. And he was also authorized to select and lay off three suitable squares, within this addition to the town, on which might be erected a State-house, a court-house, and a jail, — one square for each building, — for the use thereof, for ever, and for no other use.

The sales were to be for cash, and the Governor was directed to make deeds to purchasers when the purchase-money was paid. A patent issued to Governor John Pope for the land. In October, 1833, he proceeded to sell at auction, in lots and blocks, the fraction No. 2, in part, to Ambrose H. Sevier, under whom most of the defendants on No. 2 claim. Those who have answered deny that they had any knowledge of the claim of Cloyes when they purchased and took title; and that complainants stood by, permitted the purchase, and saw great city improvements made, and large sums of money expended, without objection, or any intimation being given that they intended to bring forward any such claim as the one now set up. But, as remarked in the outset, this court has no jurisdiction of these matters, and must therefore leave them to the State courts for adjudication and final settlement.

How, then, did the claim of the complainants stand when the city lots were sold in 1833? Cloyes never offered to enter fraction No. 2 alone; he offered to enter, says the bill (28th May, 1831), with the register at Batesville, sectional quarter No. 2 for $30\frac{8.8}{100}$ acres; northeast fractional quarter for $42\frac{32}{100}$ acres; and northwest and northeast fractional quarters of section No. 1, containing $35\frac{41}{100}$ acres; making

in all $108\frac{61}{100}$ acres. . The proof made was, that he resided on No. 2 for $30\frac{88}{100}$ acres. This entry was refused, on a ground not open to controversy. By the act of 1830, only that quarter-section on which the improvement was could be entered, no matter what quantity it contained. In this we are unanimous now; and also, that the entry allowed is void for all but the fraction No. 2. Here was an offer to enter in 1831 that could not be lawfully done at that time; then a refusal to receive the entry was proper. The claim to enter $108\frac{61}{100}$ acres was adhered to, throughout, by Cloyes and his heirs. The offer to enter the whole quantity of $108\frac{61}{100}$ acres was again made in 1834; and we agree in opinion that the entry could not be lawfully received at the latter period for this larger quantity; less than the whole was never claimed.

As already stated, the entry that was admitted in 1834 was made to enable the party to litigate his rights, if any existed, as against the city title; not because the claim to enter was lawful, in the estimation of the Secretary of the Treasury and the Commissioner of the General Land-Office, for they had decided against its validity. The offer to enter being illegal, and the entry as received being illegal, it is not perceived on what ground a court of equity can uphold the claim even in part, and thereby overthrow a patent of the United States, and oust purchasers who relied on such patent.

In the next place, when the act of June 15, 1832, was passed, authorizing the Governor of Arkansas Territory to locate the thousand acres, the act of 1830 had expired; no right of entry existed in Cloyes. The land appropriated to public use was to be taken "contiguous to and adjoining the town of Little Rock"; all the land adjoining was reserved by the act, subject to a selection by the Governor, as a public agent; the grant was a present grant of the thousand acres, without limitation. Cloyes had no claim to interpose at that time; and on the selection being made, it gave precision to the land granted, and the title attached from the date of the act. In the language of this court, in Rutherford *v.* Greene's Heirs (2 Wheat. 206), the grant which issued to Governor Pope in pursuance of the act of June 15, 1832, "relates to the inception of his title." That also was a present grant of 5,000 acres to General Greene, made by an act of the Legislature of North Carolina, but unlocated by the act of Assembly. It was granted in the military district generally, and ordered to be surveyed by certain commissioners. Soon afterwards it was located by survey, and the question presented to this court was, as to what time the title had relation for the land selected; when it was held, that the

grant was made by the act directly, and gave date to the title, and of necessity overreached all intervening claims for the land selected.

This case is far stronger than that. Here the act of 1830 was made part of the act of July 14, 1832; they stood as one act, and took date on the 14th of July. The act provides, " That no entry or sale should be made, under the provisions of this act, of lands *which shall have been reserved* for the use of the United States, or either of the States. The land, to the quantity of one thousand acres, adjoining the then town of Little Rock, had been expressly reserved by the act of the 15th of June, and stood so reserved when the act of July 14th was passed, subject to selection in legal subdivisions. The act of June 15th had no exception; the object was of too much importance to allow of any. If this villager could claim a preemption, so might any other, and the act of June would have been without value, as the whole grant might have been defeated by occupant claims, and the seat of government transferred to private owners. This is manifest. Cloyes was a tinner, carrying on his trade in the edge of the town, and next his dwelling; adjoining to his house and shop he cultivated a garden, and on this occupancy and cultivation his claim was founded. Others, no doubt, were similarly situated. The seat of government was located on the public lands, then unsurveyed; and if the act of July 14, 1832, conferred an equity on Cloyes to take 160 acres, so it did on others in his situation all around the then town, and adjoining thereto. If the occupant could take the land adjoining, how was it possible for the Governor to add lots and squares to the seat of government? The intention of Congress manifestly contemplated that the right of selection should extend to all lands adjoining the then town; and that these were reserved for public use is, in my judgment, hardly open to controversy, on the face of the act of July 14th. But when we take into consideration the fact, that General Greene's title had been upheld on the principle that it took date with the act making the grant, and that the grant made in trust to Governor Pope depended on the same principle, and equally overreached all intervening claims, no doubt, it would seem, could well be entertained, either at the General Land-Office or by purchasers, that this occupant had no just claim, and could not interfere and overthrow titles derived under the act of June 15, 1832.

And this is deemed equally true for another and similar reason. If this preference of entry for public use could be overthrown by a subsequent preëmption law, so may every other made to

secure locations for county seats and public works. The reservation was quite as definite as where salt springs and lead mines were reserved, or lands on which ship-timber existed. In such cases the President determines that the lands shall be reserved from sale, and this is always done after the surveys are executed and returned; and certainly, had such power been vested in him to reserve lands *adjoining* the seat of government of Arkansas, for the use thereof, he could have lawfully made the selection; and authority to do so having been conferred by Congress on the Governor, his power was equal to that of the President in similar cases, where lands are reserved for public use by general laws.

For these reasons, I think the decree ought to be affirmed; and I have the more confidence in these views, because they correspond with the accumulated intelligence and experience of those engaged in administering the Department of Public Lands, and with the practice pursued at the General Land-Office, from the date of the act of July 14, 1832, to this time.